F. #2021R00239

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

ROMAN NIKOGHOSYAN,
    also known as "Roma,"

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.  21-MJ-832 (PK)


## MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL DETENTION


JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Matthew R. Galeotti
Dana Rehnquist
Assistant U.S. Attorneys
   (Of Counsel)

PRELIMINARY STATEMENT

The defendant, Roman Nikoghosyan, has been charged by complaint with extortion conspiracy, namely obtaining United States currency from a victim by means of threatened force, violence and fear. The charged offense arises from the defendant's long-running scheme to extort an individual ("Victim-1") after Victim-1 declined to participate in Nikoghosyan's narcotics distribution business. The extortion relied heavily on the fear instilled by Nikoghosyan's public displays of violence, which were broadly known in the Brighton Beach and Manhattan Beach communities of Brooklyn, New York. Moreover, the defendant is a member of KavKaz Nation ("KavKaz"), a criminal enterprise that operates in the Eastern District of New York and elsewhere, including by participating in the conduct described herein.

The government respectfully submits this memorandum requesting the Court enter a permanent order of detention against Nikoghosyan. The charge against the defendant is serious, the evidence against him is overwhelming, and he faces a significant sentence if convicted. Indeed, judicially authorized wiretap communications captured Nikoghosyan admitting to the charged crimes, and in some cases boasting about dangerous and reckless behavior that puts the community at significant risk should the defendant be released. The defendant is also a flight risk as he is not a United States Citizen and has ties to a foreign country. Moreover, the defendant can use his ties to the criminal enterprise and foreign resources to retaliate against victims known and unknown, engage in other harmful and criminal conduct, and flee the United States in order to avoid prosecution—as such, the defendant should be detained.

Indeed, just over one week ago, Nikoghosyan engaged in conversations regarding, and in furtherance of, a separate KavKaz member's escape from the Vernon C. Bain Correctional Center in the Bronx, New York. As law enforcement discovered via intercepted

communications, pursuant to a judicially authorized wiretap, the escapee stated that he had "come down from the fifth floor on a rope," jumped into the water and swam to his escape from the jail barge. Thereafter, Nikoghosyan helped the KavKaz escapee devise a plan to flee New York and meet Nikoghosyan in California. Shortly thereafter, however, the escapee was apprehended by law enforcement and taken into federal custody. Events like these have highlighted the danger presented by Nikoghosyan, in addition to his resourcefulness and willingness to aid flight and disregard law and order.

The facts summarized herein are derived from months of judicially-authorized intercepted communications, consensually recorded conversations, physical surveillance, review of electronic communications, and debriefing witnesses, among other things.[1]

## STATEMENT OF FACTS

I. <u>KavKaz and the Defendant</u>

The defendant is a member of KavKaz, a criminal enterprise that draws on ties to the Caucus region of Eurasia, namely Armenia, Uzbekistan, parts of Southern Russia, and Azerbaijan. The principal purpose of KavKaz is to generate money for its members and associates through their commission of various criminal activities, including drug trafficking, robbery and extortion, among other activities. The members and associates of KavKaz also further the enterprise's criminal activities by threatening economic injury, using and threatening to use physical violence, including stabbings, and providing protection to its own members.

---

[1] All the recorded conversations quoted in this letter are prepared in draft form only. The government will prepare a finalized version of the transcripts in advance of trial. The government also hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case. In order to preserve the integrity and confidentiality of the government's investigation, notice of some of the defendants of the wiretap interceptions prior to their arrest was not feasible. This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

Although the primary purpose of KavKaz is to generate money for its members and associates, the members and associates at times use the resources of the enterprise to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of KavKaz.

Members of KavKaz refer to their membership in the enterprise as the "K-WAY" or "K WAY," sometimes with multiple "A"s, including on various social media platforms. Members further use the slogan, "K-WAY is the only way." Further, as depicted in the pictures of Nikoghosyan below, members use hand symbols to signify their association in the enterprise, including holding four fingers up outstretched, which signifies a "K" for KavKaz, and often wear jewelry or articles of clothing emblazoned with the word "KAVKAZ."



Nikoghosyan is a high-ranking member of KavKaz, who has used his influence to assault victims without retribution, extort victims, engage in fraud schemes, and order others to engage in criminal conduct at his direction. The presently charged conduct provides an illustrative example. Nikoghosyan, relying on his status, including broad knowledge in the

3

community of his dangerousness, made an extortionate demand on his own, and then conspired with other KavKaz members to execute the scheme, collectively forcing Victim-1 to make cash payments under threat of physical harm.

II.     The Charged Conduct

As outlined in further detail in the Complaint (ECF No. 1), Victim-1 is a former associate of Nikoghosyan.  The investigation has revealed that in or about December 2020 or January 2021, Victim-1 began to work for Nikoghosyan; specifically, Victim-1 delivered packages at Nikoghosyan's direction in exchange for compensation.  At some point thereafter, Victim-1 learned that the contents of his deliveries contained marijuana and declined to continue working for Nikoghosyan.  Nikoghosyan became angry with Victim-1 for refusing to work for Nikoghosyan and negatively impacting Nikoghosyan's narcotics sales business.  Nikoghosyan asserted that Victim-1's refusal to work cost Nikoghosyan $5,000, which Victim-1 would now have to pay Nikoghosyan.  When Victim-1 declined, Nikoghosyan threatened Victim-1 with physical harm.  Victim-1 temporarily obliged Nikoghosyan by again participating in marijuana sales, but subsequently declined to participate.  Thereafter, Nikoghosyan stated that Victim-1 owed Nikoghosyan $10,000, and if Victim-1 did not pay such money, Victim-1 would face physical harm.  Specifically, when Victim-1 told Nikoghosyan that he did not have the money to pay Nikoghosyan, Victim-1 recalls that Nikoghosyan, responded, in sum and substance and in part, "things stopped because you aren't working."  Nikoghosyan told Victim-1 in person that Nikoghosyan would break Victim-1's legs and stab him or her if Victim-1 did not pay Nikoghosyan.

In the weeks to follow, Nikoghosyan continued to threaten Victim-1 with physical harm.  For example, one evening when Victim-1 was in a vehicle in the vicinity of an auto body

shop, Nikoghosyan, who was with two other individuals, approached and surrounded Victim-1's car. Nikoghosyan proceeded to yell at Victim-1, in sum and substance, "come out of the car, pussy." Nikoghosyan then hit the vehicle, with Victim-1 and others inside, with an object. Victim-1 did not get out of the car, and ultimately drove away from the auto body shop. Victim-1 was fearful for his/her life during this encounter and ultimately called 911 after it.

Nikoghosyan also engaged Bazarov and Bekmuratov to assist Nikoghosyan in the extortion of Victim-1 by acting as intermediaries. Specifically, Bazarov and Bekmuratov agreed to solicit cash payments from Victim-1 on behalf of Nikoghosyan, while reiterating to Victim-1 that Nikoghosyan had threatened to use physical force were Victim-1 not to meet the extortionate demands. Ultimately, Victim-1 made two extortionate payments to the defendants (which payments were provided by and at the direction of law enforcement): a $1,000 payment to Bekmuratov via the Zelle money transfer application, and a second $1,000 payment to Bekmuratov in person. Thereafter, as the defendants had agreed, Bekmuratov transferred some or all of the extortionate funds paid by Victim-1 to Nikoghosyan.

III. Other Instances Demonstrative of the Defendant's Dangerousness

    A. Assaults

Intercepted calls also revealed Nikoghosyan's use of violence and extortionate means to obtain money from another individual ("Victim-2"). Nikoghosyan specifically discussed the assault of Victim-2 on the intercepted phone with an unidentified male caller (UM):

> NIKOGHOSYAN:    Hello. [UI conversation in the background].
>
> UM:    Hello. [UI noise in the background]
>
> NIKOGHOSYAN:    [Out of breath]. Come down to Cats now.

5

| | |
|---|---|
| UM: | We are here, brother. |
| NIKOGHOSYAN: | We're fucking [UI] good. We're killing him/her now. Out of my car— |
| UM: | Please [UI]. |
| NIKOGHOSYAN: | [Out of breath, seems like fighting with someone]. Take the—You're gonna—You gotta—You're gonna die now, nigga! [Noises in the background]. You're gonna die, nigga! You'll suck—I'm gonna fuck you! [Background music and noise]. |

In this conversation Nikoghosyan is overheard directly threatening an individual—"You're gonna die, nigga! You'll suck—I'm gonna fuck you!"—and informed the UM, with whom Nikoghosyan was speaking over the phone, that Nikoghosyan was "killing him/her now" as Nikoghosyan proceeded to order Victim-2 out of his vehicle. The next day, Nikoghosyan called a Co-Conspirator ("Co-Conspirator-1") and told him that Nikoghosyan was going to "fuck the nigga one more time." Co-Conspirator-1 responded that Nikoghosyan "has already slapped the person and that is enough," to which Nikoghosyan replied that "when I fuck, I fuck to the end." On other intercepted calls, Nikoghosyan admitted to assaulting Victim-2, including by stating, "Yea, I fuck that nigga" and "s/he didn't behave [him/her]self and I beat him/her up."

In addition to the assault of Victim-2, intercepted communications also reveal that Nikoghosyan assaulted another individual ("Victim-3"). Specifically, Nikoghosyan confessed, "I smacked that nigga (Victim-3), s/he fucked up." After being told to "calm down," Nikoghosyan continued, "I wanna fuck that nigga up."

On another intercepted communication, Nikoghosyan discussed his participation in the assault of yet another individual ("Victim-4") who Nikoghosyan admitted to "hitting on the face" and was attempting to find in order to harm further. Nikoghosyan called a Co-

6

Conspirator ("Co-Conspirator-2") and said that Nikoghosyan was "going to violate this nigga" and that "they don't know who they fucking with."

Approximately thirty minutes later, Nikoghosyan received a call from a co-conspirator ("Co-Conspirator-3") who asked if Nikoghosyan was "okay" and if Nikoghosyan did "something bad" to someone. Nikoghosyan responded, "I don't think so, I think I hit someone on the face or on the neck with the handle." Co-Conspirator-3 then asked if Nikoghosyan "hit that person with the handle." Nikoghosyan responded, "yes, with the handle, but also with the front... it looks like it slightly hit someone's neck or face." Nikoghosyan further stated that he was "looking for them right now" because he was "going to slaughter them." Co-Conspirator-3 then told Nikoghosyan "to come over and they will find them." Approximately, fifteen minutes later, Nikoghosyan called Co-Conspirator-3 who informed Nikoghosyan that it "looks like that [person's] eye was cut open." Nikoghosyan stated that Nikoghosyan's "body is shaking" and that Nikoghosyan "wants to find those faggots" and that he "has been searching for those guys "everywhere in Brighton."

B. Threats Against Victim-5

Intercepted communications also revealed that Nikoghosyan, together with others, made credible threats of violence against another individual ("Victim-5") who Nikoghosyan claimed owed him money. When it became clear to Nikoghosyan that the individual was not going to pay the money Nikoghosyan believed was owed, Nikoghosyan proceeded to call various individuals in effort to find a photograph of Victim-5 so that Nikoghosyan could "track [him/her] down."

As time went on and the money remained unpaid, Nikoghosyan's threats against Victim-5 escalated. Specifically, Nikoghosyan informed an unidentified male that he was going

7

to "shoot that motherfucker. I don't know whomever s/he owes, or whatever, I'm going to fuck his/her mother." Nikoghosyan continued, "I'm going to slaughter him/her, I swear, there is no other way around it . . . I'm going to shoot him/her and stand right on his/her head." Nikoghosyan added that he was not worried about getting caught and going to prison and that he wanted to "take care of" Victim-5. Later that night, Nikoghosyan spoke to a Co-Conspirator ("Co-conspirator-") and told him, (Victim-5) "has to die." Co-conspirator- replied, "That's for sure. Fuck his/her mother! That kind of motherfuckers always die. Look at that douche bag's face; does s/he really deserve to live?" Nikoghosyan then said he would send Co-conspirator- a photo of the individual they were discussing via Telegram because he did not want the photo saved on his phone. An hour later, Nikoghosyan called Co-conspirator- and told him, "I just want to catch . . . that motherfucker!" he said, "I have it planned already."

    C. <u>Aiding and Abetting Co-conspirator-5's Escape from Custody</u>

    In addition to the multiple acts of violence Nikoghosyan discussed during the course of the investigation, he also had conversations regarding, and in furtherance of, an individual's escape from custody. During the early hours of June 10, 2021, Nikoghosyan received a call from a co-conspirator ("Co-conspirator-5") during which call Co-conspirator-5 informed Nikoghosyan, in sum and substance, that he had escaped from custody. Among other things, Co-conspirator-5 stated, "[t]hey won't even know I am gone for another week probably" and that he (Co-conspirator-5) "almost died today" because he had to "come down from the fifth floor on a rope." Co-conspirator-5 added that he jumped from the "boat," <u>i.e.</u>, the jail barge, into the water and swam.

    After receiving this call from Co-conspirator-5, Nikoghosyan began to call various individuals in order to help Co-conspirator-5 and ensure that he successfully completed

his escape and evaded law enforcement detection.  First, on July 10, 2021 at approximately 12:53 a.m., Nikoghosyan, called his mother, Narine Petrosyan, and stated that he (Nikoghosyan) has a friend that escaped and urgently needed to come pick up money.

Then, on July 10, 2021 at approximately 12:55 a.m., Nikoghosyan called an unidentified male and stated that "scorpion" had escaped from the most "shitty" place, a "boat" and that he "jumped from the fifth floor."  Nikoghosyan then stated that he was going to try to figure out how to get "scorpion" from New York to California.

Two minutes later, at approximately 12:57 a.m., Nikoghosyan called Co-conspirator-5 and asked him if he knew where Nikoghosyan's "new building" was located; Co-conspirator-5 responded affirmatively.  Nikoghosyan instructed Co-conspirator-5 to go to Nikoghosyan's girlfriend's car, which was parked by "the building" after picking up the keys from Nikoghosyan's doorman.  Conspirator-5 asked if the car was "functional" and stated that he needed to be able to drive it to California.  Nikoghosyan stated the car was "fine" and that Co-conspirator-5 would need to get the money from Nikoghosyan's mom in the morning.  The two went on to discuss details of the plan and Nikoghosyan offered to send Co-conspirator-5 money by Zelle or Venmo.

On July 10, 2021 at approximately 1:02 a.m., Nikoghosyan, called his mother, Narine Petrosyan, and stated that "[a nickname for Co-conspirator-5]" had escaped, to which Petrosyan, responded, "[Co-conspirator-5] has escaped?"  Nikoghosyan then shouted at Petrosyan to be quiet and not say the name.  Nikoghosyan stated that he would send a number to Petrosyan and that Petrosyan should send $2,000 to the account associated with that number.

On July 10, 2021, at approximately 1:03 a.m., Nikoghosyan called his apartment building and told an unidentified male to give his car keys to his friend who was going to stop by soon.

Then, at approximately 1:04 a.m., Nikoghosyan called Co-conspirator-5 and asked for "the number," which law enforcement believes refers to the number where Nikoghosyan could send Co-conspirator-5 money via Zelle as previously discussed.

On July 10, 2021, at approximately 2:59 p.m., Nikoghosyan received a call from Petrosyan. Nikoghosyan told Petrosyan his "friend" was going to come by her place and rest while Nikoghosyan found him a car. Petrosyan expressed reservations and said it was dangerous. Petrosyan asked Nikoghosyan where else he could send his friend. Nikoghosyan asked Petrosyan not to talk too much and that his friend would come to her place. Petrosyan replied that there were cameras in her building, to which Nikoghosyan said, "It doesn't matter, he will hold his head down."

Shortly thereafter, however, Co-conspirator-5 was apprehended by law enforcement and taken into federal custody.

D. <u>Admissions</u>

In addition to Nikoghosyan's participation in a variety of dangerous criminal conduct, over the intercepted calls, he also boasted about his reckless behavior that puts the community at risk. As just one example, on May 31, 2021, Nikoghosyan called one of his associates, who asked about one of Nikoghosyan's warrants. Nikoghosyan replied, "It was a State warrant. I stabbed someone . . . . And probably that's why but I was released the next day. You get it?" Nikoghosyan's friend told Nikoghosyan to be careful. Nikoghosyan responded, in

10

sum and substance and in part that he is "state criminal" who "can slice someone or rob" without fear of serious consequences.

      E. <u>Access to Weapons</u>

Not only does Nikoghosyan pose a danger to the public because of the various assaults, threats, and extortions in which he has been involved, but he also has access to various weapons including knives and guns. For example, a 2017 routine parole search of Nikoghosyan's previous apartment resulted in the recovery of five knives, one of which was in plain view and the other four were found in the cookie jar in his kitchen. During the course of this investigation, law enforcement has also been informed by an individual familiar with Nikoghosyan that Nikoghosyan possesses a firearm. During an intercepted call, Nikoghosyan informed an unknown individual, when they warned Nikoghosyan to be safe if he were to go to a specific location, "[b]ro, I have an automatic gun with me. I don't give a fuck where I'm going." In addition, a search of a stash house used by Nikoghosyan resulted in the recovery of Hi-Point 995 rifle, which was located under the bed in the locked room rented exclusively by Nikoghosyan, pictured below:



At least 47 rounds of ammunition and narcotics were also recovered during the search of the stash house.

ARGUMENT

I. <u>Legal Principles</u>

Federal law requires that a defendant must be detained pending trial if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). A finding of dangerousness must be supported by clear and convincing evidence; a finding of risk of flight must be supported by a preponderance of the evidence. See <u>United States v. Ferranti</u>, 66 F.3d 540, 542 (2d Cir. 1995); <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987). In the pretrial context, the government bears the burden of showing that the defendant should be detained. <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2d Cir. 2001).

Courts consider several factors in making the determination of whether detention is appropriate: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including his past conduct, criminal history; and (iv) the nature and seriousness of the danger to the community or to an individual in the event of the defendant's release. See 18 U.S.C. § 3142(g). In making this determination, the Court is entitled to rely on evidence presented by proffer. See <u>United States v. Abuhamra</u>, 389 F.3d 309, 320 n.7 (2d Cir. 2004); <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000).

II. <u>The Defendant Should Be Detained</u>

The nature and circumstances of the charged offense—extorting an individual with numerous threats of physical violence—as well as the defendant's status and involvement in

the KavKaz criminal enterprise, the strength of the evidence, the history and characteristics of the defendant, and the seriousness of the threat presented by him, all support the defendant's detention as a danger to the community. Moreover, the overwhelming evidence of the defendant's guilt, Nikoghosyan's involvement in aiding Co-conspirator-5's escape from custody, and the lack of United States citizenship, all make Nikoghosyan's risk of flight abundantly clear. Thus, as set forth below, each factor under Section 3142(g) weighs in favor of detention.

    A. <u>The Nature and Circumstances of the Offense</u>

        The nature and circumstances of the charged crime weighs heavily in favor detention. First, as set forth above, the defendant's charge relates to an extortion of Victim-1 by means of threatened force, violence and fear. The defendants sought out Victim-1, and indeed tried to "lure" him to meetings—meetings in which Victim-1 would be meeting with Nikoghosyan, whose willingness and intention to use physical force against Victim-1 was well known. The defendant's threats, even at times while fearing law enforcement surveillance, evidence a callous disregard for life and the law. Second, the charges in the complaint alone expose the defendant to significant punishment, as the defendant faces up to twenty years in prison, and therefore provide the defendant with an incentive to flee. <u>See</u> 18 U.S.C. § 1951(a).

    B. <u>The Weight of the Evidence</u>

        The weight of the government's evidence of the charged offense is strong. It includes, among other things: (i) recorded conversations between the defendants and Victim-1; (ii) intercepted telephone calls in which the defendants actively discuss the offense conduct; (iii) law enforcement surveillance during which the extortion payment is made; (iv) the testimony of law enforcement officers familiar with the defendants' appearances; (v) electronic communications and media; and (vi) witness testimony.

Nikoghosyan cannot credibly claim that he was not engaged in a conspiracy to extort money from Victim-1. Therefore, the weight of the evidence weighs heavily in favor of detention.

### C. The History and Characteristics of the Defendant

Nikoghosyan's offense conduct follows a long history of violent and criminal behavior. His prior state convictions include the following: (1) criminal possession of a weapon; (2) grand larceny; (3) attempted robbery, causing physical injury; and (4) reckless endangerment, between 2015 to 2020.

It is clear that, if released, that Nikoghosyan poses a serious danger to potential witnesses and the community at large. His dangerousness is made more serious by his status as a high-ranking member of KavKaz and the risk of obstruction of justice—there is a serious risk that the defendant, or someone working on his behalf, will attempt to obstruct justice in this case. Although his detention cannot entirely prevent obstruction by Nikoghosyan's criminal associates, it will limit his ability to direct such conduct or engage in it himself. Therefore, the history and characteristics of the defendant also weigh in favor of detention.

### D. Danger the Defendant's Release Poses

The very nature of the charge shows how the defendant has posed a danger to the community by threatening victims with physical harm, including death, in order to fill the defendant's own pocket. Here, not only does the release of the defendant pose a harm to the community in general, but to specific individuals including, but by no means limited to, Victim-1, who are the direct subjects of the defendant's criminality.

The danger the defendant poses to the community if released is overwhelming. In just two months, Nikoghosyan has threatened or actually harmed several individuals. He has

boasted that he has an "automatic gun," he has access to equipment, including police radios, that aid him in evading law enforcement detection, and he has clearly stated that he does not fear, nor is deterred by, the threat of imprisonment.

    E.  Risk of Flight

Nikoghosyan presents a significant flight risk because he is not a United States citizen (though he is a legal permanent resident), and he has significant ties abroad, to Armenia, Uzbekistan, and Russia.  See, e.g., United States v. Baig, 536 F. App'x 91, 93 (2d Cir. 2013) (affirming detention order in part because the defendant "though a permanent resident of the United States, is a citizen of Pakistan and maintains ties there") (citing United States v. Mercedes, 254 F.3d 433, 438 (2d Cir. 2001) (reversing district court's grant of bail where defendant was a permanent resident of the United States and had consented to electronic surveillance and home monitoring)); United States v. El-Hage, 213 F.3d 74, 80 (2d Cir. 2000) (noting that a defendant's "history of travel and residence in other countries" as one that has been long-approved by the Second Circuit in determining whether a defendant should be detained).

The defendant poses a risk of flight for two additional reasons that go beyond his ties to foreign countries.  First, the countries to which the defendant would likely flee—Armenia, Russia or Uzbekistan—do not have an extradition treaty with the United States.  Second, as set forth above, the evidence against the defendant is overwhelming, which, coupled with the significant penalties he faces—punishable for up to 20 years' imprisonment, see 18 U.S.C. § 1951(a)—and the prospect of deportation, increases his incentive to flee.  As the Second Circuit recently concluded, risk of flight alone, when coupled with incentives to flee and ties to another country, can warrant detention, regardless of whether a defendant is able to offer an impressive bail package and agree to elaborate conditions of pre-trial release.  See United States

15

v. Boustani, 932 F.3d 79, 82 (2d Cir. 2019) (affirming detention based on flight risk alone, based in large part on the white-collar charges against him and the incentive and means to flee).

## CONCLUSION

For the reasons set forth above, the Court should enter a permanent order of detention against Nikoghosyan.

Dated: Brooklyn, New York
       July 20, 2021